Paul B. Salvaty (SBN: 171507)
PSalvaty@winston.com
Nikki S. Khorram (SBN: 327322)
NKhorram@winston.com
WINSTON & STRAWN LLP
333 S. Grand Ave, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile:  (213) 615-1750

Denise Scofield (*pro hac vice to be submitted*)
DScofield@winston.com
Caitlin Gernert (*pro hac vice to be submitted*)
CGernert@winston.com
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, TX 77002-2925
Telephone: (713) 651-2600
Facsimile:  (713) 651-2700

Attorneys for Plaintiff:
5E BORON AMERICAS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| 5E BORON AMERICAS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MATRIX SERVICE INC.,<br><br>Defendant. | Case No. **5:23-cv-01396**<br><br>**COMPLAINT FOR:**<br><br>  1. **BREACH OF CONTRACT**<br>  2. **BREACH OF EXPRESS WARRANTY** |

Plaintiff 5E Boron Americas, LLC, by and through its undersigned counsel, hereby files this Complaint against Defendant Matrix Service Inc., and complains and alleges as follows:

## I.   INTRODUCTION

1.   This lawsuit involves an ongoing dispute between 5E Boron Americas, LLC ("5E"), and Matrix Service Inc. ("Matrix"), regarding Matrix's mismanagement of a construction project to build a small-scale boron facility in Newberry Springs, California.   5E is asserting breach of contract and warranty claims arising out of Matrix's substandard performance of the work at a cost exceeding that agreed to by the parties.

## II.   JURISDICTION AND VENUE

2.   **Jurisdiction.**  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy is more than $75,000.

3.   This Court has personal jurisdiction over Matrix because it has conducted or transacted business in this State and this District from which this action arises.

4.   **Venue.**  Venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred within this District.   Venue is also proper pursuant to Article 50.8 of the Procurement and Construction Contract ("Contract") entered into by the parties, which provides that "any action brought to enforce or interpret any provision of this Contract, will be filed in the federal or state court having jurisdiction and venue over San Bernardino County, State of California."

## III.   PARTIES

5.   **Plaintiff.**  5E is a Delaware limited liability company.   The sole member of 5E is American Pacific Borates Pty Ltd.   American Pacific Borates Pty Ltd. is an Australian proprietary limited company with its principal place of business in Perth,

Western Australia.

6.   **Defendant.**  Matrix is an Oklahoma corporation with its principal place of business in Oklahoma.  Matrix is registered to do business in the State of California and may be served with process through its registered agent CT Corporation System, 330 N. Brand Blvd., Glendale, CA 91203.

## IV.   FACTS APPLICABLE TO ALL COUNTS

### A.   The Project

7.   5E is focused on becoming a vertically integrated global leader and supplier of boron specialty and advanced materials whose mission is to enable decarbonization, increase food security, and ensure domestic supply of critical materials.

8.   Matrix provides construction, maintenance, and fabrication services to energy and industrial markets across North America.

9.   Effective April 26, 2022, 5E and Matrix are parties to a Procurement and Construction Contract (the "Contract").[1]  The Contract provides for Matrix to construct a small-scale boron facility ("SSBF"), in Newberry Springs, California, that would serve as the first new U.S. based source of boron production in more than 50 years (the "Project").  The SSBF would precede the construction of a large-scale boron and lithium complex that would provide critical and domestically sourced materials for decarbonization applications.

### B.   The Contract

10.   Pursuant to the Contract, Matrix agreed to provide "all project management, Procurement Services, Goods, Construction Work, and those duties allocated to Contractor in the Commissioning before Mechanical Completion and Commissioning after Mechanical Completion, as may be necessary to fulfill the Scope

---

[1] Fort Cady (California) Corporation and Matrix were the original parties to the contract. Following reorganization, Fort Cady (California) Corporation became 5E. The parties amended the Contract to reflect the assignment of the Contract from Fort Cady (California) Corporation to 5E.

of Work," including anything that is "ancillary or necessary by implication to fulfill the Scope of the Work" ("Work").  Matrix was not required to provide engineering services for the Project.

11.    Scope of Work is defined as the "description of the scope, standards, Milestones, and the program of work set out in Appendix A – Scope of Work, as amended by any Changes."

12.    "Procurement Services" is defined as "the procurement of Procured Goods performed by the Contractor, which may be performed as agent of the Owner, or for the Contractor on its own account, as stipulated in the Scope of Work."

13.    The term "Goods" is defined in the Contract as "any goods, supplies, materials or equipment required as part of the Work, or to perform the Work, and which are supplied or fabricated by the Contractor, but does not include Procured Goods."

14.    "Construction Work" is defined in the Contract as "delivery, fabrication, assembly, construction, testing, commissioning and correction, including professional and technical personnel, labor, supervision, administration, materials, transportation, supplies, tools, equipment, and such other work and materials necessary to be performed or supplied to meet the requirements of the Contract."

15.    The Contract contains several material obligations that are relevant to this dispute.

i.    Contractor's Obligations

16.    Matrix was responsible for managing the Construction Work pursuant to Article 4.12 of the Contract.  These responsibilities included: providing weekly activity reports with a three week look ahead schedule; cost monitoring, scheduling and monthly reporting to 5E; and ensuring that the Work was performed in an efficient manner.

17.    Under Article 8 of the Contract, Matrix agreed to perform the Construction work in accordance with the Contract.  Matrix agreed to "supply or cause to be supplied all services, equipment and materials required for the proper execution and completion of the construction Work" and take "full responsibility for the adequacy, stability and

safety of the Work and the Work Site operations under its control, of all methods of construction and of all of the Construction Work."

18.    Pursuant to Article 10 of the Contract, Matrix agreed to perform the Work in a "professional, efficient and workmanlike manner, using only qualified, skillful and careful workers, in strict accordance with the Contract and in accordance with sound and currently accepted design, engineering, procurement, construction and commissioning practices normally employed in industrial construction similar to the Work."

19.    Pursuant to Article 10 of the Contract, Matrix also agreed to perform the Work to meet the Scope of Work and to "comply with the material terms of the Contract, including, but not limited to, all time schedules set out in, or called for, by the Contract or Execution Plan."

20.    Pursuant to Article 11 of the Contract, Matrix agreed to "achieve Mechanical Completion of all Work by the Scheduled Mechanical Completion Date."

21.    Under Article 17 of the Contract, Matrix was required to "inspect and be solely responsible for the inspection of all workmanship, materials and equipment furnished by itself or its Subcontractors in respect of the Work, to ensure conformity in each and every respect to the Contract and the Law and to ensure that good and proper construction practices are followed."

ii.    Change Orders

22.    Article 13 of the Contract outlines procedures for making changes to the Contract, and, if warranted, the payment of additional compensation for the performance of the Work to accommodate the changes.

23.    Under the Contract, 5E had the right to make changes to the scope of Work. When a Change was proposed by 5E, the Contract stipulated that 5E would issue a Contemplated Change Notice to Matrix describing the proposed Change. A Contemplated Change Notice is defined as a "written notice from the Owner advising the Contractor that the Owner is contemplating a Change." If Matrix believed that the

proposed Change would affect the rate of compensation or contract time, it was required to issue a Change Quotation within "ten (10) Work Days."  If the Change Quotation was agreed to, 5E would approve the Change Quotation and issue a Change Order memorializing the Change, which would be signed by 5E and Matrix.

24.    If 5E directed Matrix to proceed with a Change before the parties could agree, or if the parties failed to agree upon the adjustment in Contract Time and Compensation, 5E was required to issue a Change Directive that directs Matrix to proceed with the Work.

25.    Notably, if Matrix determined that any instruction, interpretation, decision or direction from 5E "should have, but was not, memorialized in a Contemplated Change Notice or Change Directive being issued," Matrix was required to give 5E a Change Quotation requesting an adjustment in the schedule or contract price.  The failure to provide 5E with a Change Quotation within the specified time would result in a waiver of any claim against 5E attributable to that instruction, interpretation, decision, or direction.

iii.    <u>Warranty</u>

26.    Pursuant to Article 22 of the Contract, Matrix represented that all Work would "comply with the Scope of Work" and "be performed in accordance with all time schedules set out in or called for by the Scope of Work."  Matrix also warrantied that "the Work shall be free from any and all material defects and deficiencies."

27.    Pursuant to Article 22.3 of the Contract, Matrix agreed to "promptly repair, replace and make good all defects in the work at its own cost."  If Matrix failed to perform the requested warranty work in a commercially reasonable time, 5E could make the "necessary corrections, repairs or replacements and charge the direct cost of the same to" Matrix.

28.    Under Article 22.9 of the Contract, Matrix agreed that "neither acceptance of the Work by the Owner, nor payment for performance of the Work, shall relieve Matrix from any responsibility for defects in the Work."

**C.      Matrix's Unsupported Cost and Schedule Overruns and Substandard Work**

29.      The initial budget estimate for Matrix's original Scope of Work was approximately $9.1 million with an anticipated Mechanical Completion Date of November 30, 2022.  The budget estimate was based upon pre-engineering designs provided at the outset of the Project.

30.      On February 2, 2023, Matrix submitted a revised budget of approximately $19.7 million (of which approximately $12 million had already been spent) along with a revised schedule with a Mechanical Completion date of April 14, 2023, which was thereafter approved by 5E.

31.      5E did not approve any further revisions to the budget or schedule.

32.      On information and belief, Matrix was derelict in its management and planning responsibilities. For example, Matrix waited to plan for subsequent phases in the Project until days before the scheduled start date.  This resulted in delays in the schedule and caused 5E to incur unnecessary expediting fees on materials that should have been ordered weeks in advance.  Additionally, Matrix failed to implement a proper document management system, causing work to be performed utilizing the wrong design document revisions, leading to rework and schedule delays.

33.      On March 30, 2023, Matrix communicated and documented in their weekly meeting update that the Utility and Pregnant Leach Solutions ("PLS") areas would be complete by April 4, 2023, and April 11, 2023, respectively (including mechanical completion, piping installation, instrumentation and the changes associated with the approved drawings).

34.      Based on Matrix's representations, 5E conducted a walkthrough of the jobsite on April 7, 2023, and again on April 12, 2023, and identified significant construction defects and deficiencies with the Work that Matrix represented was complete.  Specifically, during that inspection, 5E identified over 350 defects and deficiencies.

35.     Matrix failed and/or refused to correct these defects and deficiencies in a timely manner.  Thus, 5E was forced to expend significant time, materials, and labor to remedy the punch list items, at a cost to 5E exceeding $1,000,000.

36.     For example, 5E was forced to: install and run piping, valves, and instrumentation; repair unsafe and improperly installed piping across the SSBF, including torquing, missing supports, and missing welds; finalize installation of critical safety systems (pressure relief valves); install and connect instrument air to pneumatic instrumentation; install and affix missing or improperly installed equipment; and complete installation of the safety shower and potable water systems—punch list items that Matrix had invoiced 5E for and that 5E had paid.

37.     On or about April 18, 2023, 5E notified Matrix that 5E was suspending the Work until such time as Matrix provided construction work packages for the remaining two phases of the Project: (1) the boric acid area; and (2) the gypsum area. Matrix was instructed to provide a lump sum bid that accurately detailed the materials and labor required for the remaining areas of the Project and issue a proposed schedule for completion of that work by May 24, 2023.

38.     Nearly two months later—on June 16, 2023, Matrix finally provided construction work packages for the remaining areas of the Project that included a revised budget and schedule.  Matrix represented that it physically walked the site, inspected each line, and determined from that inspection exactly what materials and labor would be required to complete the Project.

39.     However, when 5E attempted to verify the accuracy of the construction work packages, it discovered that the construction work packages contained significant errors.  For example, Matrix included material and labor for pipelines that had already been installed, signaling that Matrix was wholly unaware of the Work that had already been performed and had failed to properly supervise and direct the Work.

40.     On June 16, 2023, 5E notified Matrix that it was suspending the Contract and instructed 5E to demobilize its equipment and property from the Project site.

41.     Since Matrix has demobilized, 5E has encountered additional systemic defects to the Work. For example, Matrix improperly secured pipe using 2x4 wooden planks, requiring 5E to remove and replace them with proper pipe supports:



In addition, Matrix left certain piping noticeably misaligned and unsupported:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



42.    Other Matrix shortfalls include but are not limited to:

    a.  failing to calibrate instruments despite invoicing 5E for the calibration work;

    b.  failing to apply tax rebates with respect to the Work performed on the Project;

    c.  mis-wiring and damaging power supplies, resulting in costs for replacement of that equipment;

    d.  using incorrect materials; and

    e.  damaging valves.

1    43.   In addition, upon information and belief, 5E has paid for work Matrix did
2    not complete and/or performed deficiently.

3    44.   Matrix was timely made aware of these construction defects and
4    deficiencies through numerous communications by representatives of 5E.  Despite
5    Matrix's assurances that a corrective action plan to remediate the cost overruns and
6    construction defects would be forthcoming, nothing has been proposed or provided to
7    date. Matrix has repeatedly failed to manage and execute the Work with the diligence
8    required to complete the Project within the Contract time.

9    45.   To date, the Work completed by Matrix has proven to be materially
10    deficient, with a 56 percent reported failure rate during the most recent audit conducted
11    by 5E.

12    46.   Matrix has failed to perform the Work in accordance with Contract
13    specifications and time schedules.

14    47.   5E has continued to make good faith payments for the value of the Work
15    approved through the suspension period as indicated by Matrix's own completion
16    estimates in weekly reports.  Indeed, to date, 5E has made payments to Matrix in the
17    amount of approximately $18 million.

18    **V.   CAUSES OF ACTION**

19    **FIRST CLAIM FOR RELIEF (BREACH OF CONTRACT)**

20    48.   5E adopts and incorporates by reference all prior paragraphs of this
21    Complaint as if fully set forth herein.

22    49.   Matrix agreed in the Contract to perform its services in a "professional,
23    efficient and workmanlike manner, using only qualified, skillful and careful workers,
24    in strict accordance with the Contract and in accordance with sound and currently
25    accepted design, engineering, procurement, construction and commissioning practices
26    normally employed in industrial construction similar to the Work."

27    50.   Matrix materially breached the Contract by supplying and installing
28    defective and non-conforming materials, performing deficient and defective Work,

failing to efficiently manage the Work, and failing to perform said Work in accordance with the plans and specifications outlined in the Contract.

51. Matrix also agreed to "inspect and be solely responsible for the inspection of all workmanship, materials and equipment furnished by itself or its Subcontractors in respect of the Work, to ensure conformity in each and every respect to the Contract and the Law and to ensure that good and proper construction practices are followed."

52. Matrix materially breached the Contract by failing and/or refusing to properly manage the construction of certain aspects of the Project, including but not limited to the Utility and PLS areas.

53. Matrix agreed to "achieve Mechanical Completion of all Work by the Scheduled Mechanical Completion Date."

54. Matrix materially breached the contract by failing to achieve Mechanical Completion by April 14, 2023.

55. 5E has fully performed all conditions, covenants, and promises required to be performed on its part pursuant to the Contract or is excused from doing so based on Matrix's breach of the Contract.

56. As a result of Matrix's breaches, 5E has sustained damages associated with the additional cost of performance, including but not limited to the expenses of labor, materials, and equipment in the performance of its Work on the Project.

57. Matrix has not performed its services under the Contract consistent with generally accepted industry practices. It has not completed the services contemplated under the Contract and to the extent that it has performed such services, it has not met generally accepted industry practices.

## SECOND CLAIM FOR RELIEF (BREACH OF EXPRESS WARRANTY)

58. 5E adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

59. Matrix warranted that its Work would be free from defects and deficiencies, and agreed to promptly repair any such defects and deficiencies.

1    60.    Matrix breached its warranty by providing defective and deficient Work
2   and by failing and/or refusing to correct the same upon demand, including but not
3   limited to the defective and deficient Work relating to the Utility and PLS areas of the
4   Project, which it had inaccurately represented were completed.

5    61.    As a result of Matrix's breach, 5E has sustained damages associated with
6   the costs to correct the defects and deficiencies in Matrix's work.

7                              **REQUEST FOR RELIEF**

8   WHEREFORE, Plaintiff requests judgment as follows:

9   A.    For actual damages according to the proof at trial; and

10  B.    For other such relief that the Court may deem just and equitable.

11

12  Dated:  July 17, 2023                    Respectfully submitted,

13

14                                           WINSTON & STRAWN LLP

15                                           By:  */s/  Paul B. Salvaty*
16                                              Paul B Salvaty
                                                Denise Scofield
17                                              Caitlin Gernert
                                                Nikki Khorram
18
19                                              Counsel for Plaintiff
                                                5E BORON AMERICAS, LLC
20
21
22
23
24
25
26
27
28